# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 28 2017, 7:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

**APPELLANT PRO SE**

Antonio Jones
Carlisle, Indiana

**ATTORNEYS FOR APPELLEE**

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

## I N   T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Antonio Jones, <br> *Appellant-Petitioner,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Respondent.* | September 28, 2017 <br><br> Court of Appeals Case No. 45A04-1611-PC-2565 <br><br> Appeal from the Lake Superior Court, Criminal Division 4 <br><br> The Honorable Samuel L. Cappas, Judge <br><br> The Honorable Natalie Bokota, Magistrate <br><br> Trial Court Cause No. 45G04-0602-PC-2 |

**Mathias, Judge.**

[1] Antonio Jones appeals the Lake Superior Court's denial of his petition for post-conviction relief. Jones argues that the post-conviction court clearly erred in rejecting his claim that his trial counsel was constitutionally ineffective.

[2] We affirm.

## Facts and Procedural History

[3] Jones's convictions for the murder of four people have spawned much litigation. The facts underlying his convictions have been stated and restated by this and other courts several times. Most recently, we set forth the facts as follows:

> On January 16, 2004, at approximately 6:00 p.m., Ronyale Hearne dropped off her twenty-three-month-old son, A.J., at the home of his father, Anthony McClendon, Sr., on Polk Street in Gary. McClendon lived at the residence with Laurice and Jimmy Jones (collectively, the Joneses).
>
> Hearne and her cousin, Donte Mills, returned to the residence on Polk Street to get A.J. shortly after midnight. She went upstairs, the door was open, and she saw Laurice on the couch "like she could be dead." Tr. p. 382–84. Hearne called McClendon's brother, Roosevelt Pickens, who arrived at the scene shortly thereafter. She walked further into the apartment and saw Jimmy's body on the bathroom floor. She then saw Pickens standing over McClendon and holding A.J. It appeared as if McClendon's "whole face was just blown open." Id. at 389.
>
> Hearne took A.J. from Pickens and ran downstairs. Mills drove A.J. and Hearne to Northlake Hospital. At some point, Hearne pulled up A.J.'s shirt and noticed that he had a hole in his side.

A.J. was eventually transported to the University of Chicago Hospital by ambulance. It was determined that A.J. had suffered two gunshot wounds that had passed through his body. A.J. later died from his wounds.

Pickens telephoned his friend, Terrell Bowens, upon arriving at the scene. Bowens went to the apartment, contacted the police, and waited approximately ten minutes for their arrival. At the residence, the police saw the bodies of McClendon and the Joneses and also discovered scales and powder cocaine on the kitchen counter as well as cocaine cooking on the stove.

During the investigation, the police were able to determine that three different types of firearms were used in the murders. Autopsies performed on McClendon and the Joneses revealed that all three had died from multiple gunshot wounds.

[Also] [o]n January 16, 2004, Maurice Fuller and Anita Goldsby held a party at their apartment in Gary that started around 7:00 p.m. There were about twenty people at the party, and James Parks, Lenzo Aaron, and Jones were there and playing cards for money. At some point, Fuller bumped into Jones in the kitchen. The two were "joking around," and Jones lifted up his shirt and revealed the butt of a gun. Tr. p. 1159–60. Jones said, "You don't want none of this." *Id.* Fuller described Jones's handgun as an automatic, "like a 9mm or a .45." *Id.* at 1160.

While the three were playing cards at the party, Aaron and Parks got into an argument over some money. Jones was Aaron's partner in the card game. The argument was settled, and Aaron told Parks to keep the money in dispute. At some point, Jones walked into the kitchen and said, "We just got a call from some dude ... do you want to go rob him?" *Id.* at 1198. Jones said that the caller had $6000 and some drugs in his possession. Aaron and Parks both agreed to rob the caller, and Parks and Jones left.

However, they returned to pick up Aaron, and the three then left again in Jones's white Buick Roadmaster to commit the robbery. By this point, Aaron had seen the butt of the black semi-automatic handgun tucked into Jones's waist. An AK–47 assault rifle was also on the backseat of Jones's vehicle.

When the three arrived at the Polk Street residence, Jones went in first, followed by Parks and then Aaron. Aaron was carrying the AK–47 rifle. After the three went up the stairs, Jones knocked, someone came to the door and asked who was there, and Jones replied, "It's Tone." *Id.* at 1210. As soon as the person inside opened the door, someone fired five or six shots. After the three entered, Aaron saw Laurice and A.J. on the couch. Parks and Jones had gone to the back of the residence, and at some point, Aaron heard Parks say, "Where the sh*t at, man?" Tr. p. 1211. The man he was talking to responded, "Tone, James G. It's like this man? It's like this?" *Id.* at 1216. Laurice was pleading with Aaron, "Please, sir, don't kill me. Please don't kill me." *Id.* at 1213. Aaron shook his head to indicate he was not going to harm her. However, Aaron, who was unable to see into the back of the apartment because a sheet was hanging in the doorway, heard Parks say, "Finish him off. Finish him off." *Id.* at 1216. The others returned to the living room and grabbed the AK–47 off Aaron's shoulder. Thereafter, they went to the rear of the apartment and Aaron heard two more shots.

Jones left, while Aaron and Parks remained in the living room. Parks told Aaron, "Finish the lady off, man." Tr. p. 1216. Aaron told Parks, "Man I didn't come here for that, I ain't killing nobody," then left the apartment. *Id.* at 1217. As Aaron was leaving, he heard two more shots. *Id.*

Aaron did not take anything from the apartment, nor did he see Parks or Jones take anything. However, he was originally told that they were going to steal $6000, with each of them to take

$2000 from the robbery. Thereafter, Jones drove the three to the Oak Knoll apartments. Sometime after 12:50 a.m., Jones called Janeth Alexander for a ride, explaining that he had lost his keys. When Alexander arrived, Jones's vehicle was outside. After Alexander picked him up, and they were driving along a drainage ditch on Chase Street, Jones asked her to stop the vehicle. However, Alexander refused because the weather was bad. Jones said he had been drinking, and Alexander thought that he appeared to be "hot or sick." Tr. p. 1659. Jones rolled the window down, and she heard "something goes off—you know, hit the water." *Id*. Jones turned around and asked her, "you didn't see that, did you?" *Id*. Jones had tossed the gun into the water.

After Jones was arrested, he called Alexander from the jail. Jones told her that she was his alibi, and that his life was in her hands. After Alexander testified in another proceeding, Jones called her and said that he was going to kill her.

The day after the murders, Parks knocked on Aaron's door, gave him $230, and asked him, "was [he] straight," which Aaron took to mean, was he "cool with the $230." Tr. p. 1232. Aaron feared for his life and that of his girlfriend, so he accepted the $230. *Id*. at 1233–34.

[O]n January 19, 2004, Detective Michael Jackson talked to Jeffrey Lewis, Parks's brother, about the incident on 2600 Polk, but Lewis did not identify himself at that time. Detective Jackson spoke again with Lewis on January 20, 2004, and for the first time in person on January 21, 2004. Lewis provided a written statement. Detective Jackson spoke with Lewis several times thereafter. Lewis knew that Parks had an AK–47 and that Parks had obtained the rifle through Shawn Dixon. He had seen Parks with the AK–47 and also described to Detective Jackson a .22 caliber weapon that Parks had obtained from a person named

"Hype." Tr. p. 975–76, 986. Lewis had also seen Jones with a .45 caliber weapon on his lap before the night of the murders.

Based on information that Lewis had provided, police officers were instructed to go to three separate locations to conduct surveillance on Parks, Aaron, and Jones. Search warrants were issued that culminated in ten searches, which included the residences of Aaron, Dixon, Parks's father, Parks's cousins' home, the address where Jones allegedly resided, and Parks's girlfriend's home. Police also searched the home of Jones's girlfriend, Teshonta Champion.

Fuller had known Parks for almost six years and had gone to a gun store with him to purchase the AK–47. However, they were unable to make the purchase. Instead, Dixon went to the store and made a down payment on the weapon. Dixon purchased the rifle for Parks, who paid Dixon the money for the gun.

The AK–47 was later fired at Brandy Parks's house at the Oak Knoll Apartments on New Year's Eve. The police subsequently found nine shell casings from a 7.62 x 39 mm weapon at the quadruple murder scene. This caliber of ammunition is fired from AK–47 and AK–47 copy-type firearms. It was determined that they all had been fired from the same weapon. The police also found eighteen 7.62 x 39 mm casings near Dixon's house, all of which had been fired from the same weapon. These, in turn, were fired from same weapon that fired the nine rounds found at the Polk Street residence. The police also found seven more 7.62 x 39 mm cartridge casings, collected from Brandy's residence. Those rounds were also fired by the same weapon that fired the 7.62 x 39 mm rounds at the Polk residence.

On January 26, 2004, Aaron was arrested, and Parks was arrested the next day. On the same day, Jones entered the police station and stated that some detectives from Gary were looking

for him. Jones was also placed under arrest. When Aaron was asked about the incident on Polk Street, he requested legal counsel, and the questioning ceased. Aaron later asked to talk with Detective Richardson, and he provided a formal written statement on January 28, 2004. Aaron implicated himself in the murders on two occasions and was initially charged with four counts of murder. Aaron subsequently entered into a plea agreement on May 6, 2004, which called for him to plead guilty to four counts of class A felony robbery. It was an open plea, pursuant to which Aaron would be sentenced within a range of twenty to fifty years for each count, to be served concurrently. As a term of the plea agreement, Aaron agreed to cooperate with the police.

*Jones v. State*, No. 45A03-1111-CR-00496, 2012 WL 4048847 (Ind. Ct. App. Sept. 14, 2012), *trans. denied*.

[4] The State charged Jones with four counts of felony murder. A jury trial commenced on May 17, 2004, at the conclusion of which the jury found Jones guilty as charged. The trial court subsequently sentenced Jones to four consecutive terms of sixty years, for a total executed term of 240 years.

[5] On direct appeal, Jones claimed that the trial court erred in admitting hearsay evidence and challenged the legality and propriety of his sentence. We rejected Jones's claims and affirmed his convictions and sentence in an unpublished memorandum decision. *Jones v. State*, No. 45A03-0407-CR-339 (Ind. Ct. App. June 30, 2005), *trans. denied*. Jones subsequently petitioned for post-conviction relief, claiming that his trial counsel was ineffective. We affirmed in another

unpublished memorandum decision. *Jones v. State*, No. 45A03-0711-PC-511, 2008 WL 2746486 (Ind. Ct. App. 2008), *trans. denied*.

[6] Having exhausted his remedies at the state level, Jones turned to the federal courts for relief, filing a petition for a writ of habeas corpus in the United States District Court for the Northern District of Indiana. On September 24, 2009, the District Court entered a well-reasoned, but unpublished, opinion dismissing Jones's habeas petition. *Jones v. Finnan*, No. 2:09-cv-052-RLY-WGH (N.D. Ind. Sept. 24, 2009). Jones appealed, arguing that the admission of certain hearsay evidence violated his rights under the Confrontation Clause. A panel of the United States Court of Appeals for the Seventh Circuit reversed, concluding that this court's opinion was not simply incorrect, but amounted to an unreasonable application of clearly established federal law as determined by the United States Supreme Court. *Jones v. Basinger*, 635 F.3d 1030, 1044 (7th Cir. 2011).[1] The Seventh Circuit panel ordered the State to release Jones if he was not retried within 120 days of the Court's mandate.

[7] Jones was then retried on four counts of felony murder, and a jury found him guilty as charged. The trial court again sentenced Jones to four consecutive sixty-year terms of incarceration for a total of 240 years. Jones appealed again and argued: (1) that the trial court erred by permitting Lewis to testify about

---

[1] Under the Antiterrorism and Effective Death Penalty Act of 1996, a petitioner seeking habeas corpus relief in a federal court must show, *inter alia*, that "his detention was the result of a state court decision (1) 'contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;' or (2) 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Jones*, 635 F.3d at 1040 (quoting 28 U.S.C. § 2254(d)).

statements that were made by James Parks, Lewis's brother; (2) that the trial court erred in excluding evidence that Aaron implicated Jones in the killings as retaliation for Jones's prior testimony in an unrelated federal case against Aaron's friend; and (3) that the evidence was insufficient to support his convictions. We affirmed Jones's convictions in another unpublished decision. *See Jones v. State*, No. 45A03-1111-CR-496, 2012 WL 4048847 (Ind. Ct. App. Sept. 14, 2012).

[8] Jones then filed a pro se petition for post-conviction relief on November 10, 2015, claiming that his trial counsel during his retrial was ineffective. The trial court held evidentiary hearings on Jones's petition on December 11, 2014, February 17, 2015, April 13, 2015, and July 9, 2015. On October 21, 2016, the post-conviction court issued detailed findings of fact and conclusions of law denying Jones's petition. Jones now appeals.

## Post-Conviction Standard of Review

[9] Post-conviction proceedings are not "super appeals" through which convicted persons can raise issues they failed to raise at trial or on direct appeal. *McCary v. State*, 761 N.E.2d 389, 391 (Ind. 2002). Post-conviction proceedings instead afford petitioners a limited opportunity to raise issues that were unavailable or unknown at trial and on direct appeal. *Davidson v. State*, 763 N.E.2d 441, 443 (Ind. 2002). The post-conviction petitioner bears the burden of establishing grounds for relief by a preponderance of the evidence. *Henley v. State*, 881 N.E.2d 639, 643 (Ind. 2008). Thus, on appeal from the denial of a petition for

post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Id*. To prevail on appeal from the denial of post-conviction relief, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id*. at 643–44.

[10] The post-conviction court made specific findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). On review, we must determine if the court's findings are sufficient to support its judgment. *Graham v. State*, 941 N.E.2d 1091, 1096 (Ind. Ct. App. 2011), *aff'd on reh'g*, 947 N.E.2d 962. Although we do not defer to the post-conviction court's legal conclusions, we review the post-conviction court's factual findings for clear error. *Id*. Accordingly, we will not reweigh the evidence or judge the credibility of witnesses, and we will consider only the probative evidence and reasonable inferences flowing therefrom that support the post-conviction court's decision. *Id*.

## Effective Assistance of Trial Counsel

[11] Jones claims that his trial counsel was ineffective. Our supreme court has summarized the law regarding claims of ineffective assistance of trial counsel as follows:

> A defendant claiming a violation of the right to effective assistance of counsel must establish the two components set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient.

This requires a showing that counsel's representation fell below an objective standard of reasonableness, and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference. A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. The *Strickland* Court recognized that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. The two prongs of the Strickland test are separate and independent inquiries. Thus, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.

*Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001) (citations and quotations omitted).

[12]     Here, Jones claims that his trial counsel was ineffective because of his actions or inaction with regard to the testimony of three witnesses. We address each of these witnesses and their testimony in turn.

# I. Janeth Alexander's Testimony

*A. Testimony Concerning Jones's Threats*

[13] Jones first claims that his trial counsel should have acted to prevent the jury from hearing the testimony of Janeth Alexander ("Ms. Alexander") regarding a threat Jones allegedly made to her in 2004. During Jones's second trial, the defense listed Ms. Alexander as a defense witness to support Jones's alibi defense. The State, however, called Ms. Alexander during its case-in-chief. During direct examination by the State, Ms. Alexander testified that in 2004 Jones called her at her place of employment. Jones testimony continued as follows:

> A. He called -- Antonio called my job.
>
> Q. And what did he say?
>
> A. He had me thinking that he had got released.
>
> Q. And do you recall what he said? Was this a good call, baby, I am coming home? What was the nature of the call?
>
> A. No, it was a scary call to me because I was scared of him.
>
> Q. Okay. And do you remember what he said?
>
> A. That he no. I believe he said he was going to kill me or get me or something like that. But I know I left work.
>
> Q. Okay.
>
> A. Because I thought he was out.

Trial Tr. p. 1671.

[14] At this point, Jones's trial counsel objected to this testimony based on a lack of specificity with regard to what Jones allegedly said and because the State had

not given him any notice that Ms. Alexander would testify regarding a threat made by Jones. The State responded that Ms. Alexander was listed as a defense witness and her testimony should have been no surprise to the defense. After hearing arguments on the matter outside the presence of the jury, the trial court ruled, "State[,] ask the question, do you recall specifically what he said to you? If the answer is no, that's the end of the inquiry. If she says yes, then [it] may be a statement by a party opponent." *Id.* at 1673. Jones's counsel then requested that the trial court give "a limiting instruction that she [Ms. Alexander] is not sure and the jury should disregard it [her statement as to what Jones said to her]." *Id.* The trial court responded, "Well, let's see what the next question is. I don't know just yet. Ask to approach again after we get that answer if you think it is necessary." *Id* at 1674.

[15] The State then questioned Ms. Alexander as follows:

> Q. Miss Alexander, the phone call that you're talking about to your job, do you remember specifically what was said?
>
> A. He [Jones] said something that scared me. Like he was going to --

*Id.* at 1674. Jones's trial counsel again objected, and the trial court sustained the objection. Ms. Alexander then testified that she was scared after speaking with Jones.

[16] Jones acknowledges that his trial counsel did object to Ms. Alexander's testimony regarding Jones's threat to her over the telephone. But he claims that

his trial counsel should also have requested an admonishment when the trial court sustained his objection. However, our review of the trial transcript indicates that Jones's trial counsel did, in fact, request an admonishment. Jones's trial counsel requested that the trial court give the jury a "limiting instruction" informing the jury to disregard that aspect of Ms. Alexander's testimony. *Id*. at 1673. The trial court did not give the admonishment,[2] but this cannot form the basis for a claim that Jones's trial counsel was ineffective when he actually did what Jones claims he should have done.[3]

[17] Moreover, it has long been held that evidence of threats made by the accused against a prosecution witness can be considered as admissions of guilt and therefore are relevant and admissible to demonstrate an accused's guilty knowledge. *Matthews v. State*, 866 N.E.2d 821, 825 (Ind. Ct. App. 2007) (citing *Johnson v. State*, 472 N.E.2d 892, 910 (Ind. 1985)), *trans. denied*.[4] Thus, Ms.

---

[2] Jones claims that he was entitled to an admonishment, noting the use of mandatory language in Evidence Rule 105, which provides, "If the court admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the court, on timely request, *must* restrict the evidence to its proper scope and instruct the jury accordingly." (emphasis added). But this rule is applicable when the evidence at issue is admissible for one purpose but not another. Here, however, Jones claims that the threat evidence was inadmissible for any purpose. Therefore, Evidence Rule 105 is inapplicable.

[3] A considerable portion of Jones's argument on this issue appears to be that the trial court erred in admitting Ms. Alexander's threat testimony. But it appears that the trial court sustained Jones's objection to Ms. Alexander's threat testimony. Regardless, Jones cannot bring a free-standing claim of evidentiary error on post-conviction. *See Sanders v. State*, 765 N.E.2d 591, 592 (Ind. 2002) (in post-conviction proceedings, complaints that something went awry at trial are generally cognizable only when they show deprivation of the right to effective counsel or issues demonstrably unavailable at the time of trial or direct appeal); *Timberlake*, 753 N.E.2d at 597 (if an issue is known and available on direct appeal but not raised on direct appeal, it is waived; and if an issue is raised on direct appeal, but decided adversely, it is res judicata).

[4] Jones's citation to *Bassett v. State*, 795 N.E.2d 1050 (Ind. 2003), is unavailing. In that case, our supreme court held that testimony regarding defendant's prior acts of raping two other women and threatening to kill them if they reported the rapes was inadmissible under Indiana Evidence Rule 404(b). *Id.* at 1052–53. The court held that evidence of these crimes was improperly admitted to prove the defendant's character to show

Alexander's testimony regarding what Jones told her over the telephone was admissible evidence, and any attempt by Jones's trial counsel to request an admonishment could not have been properly granted. The same is true for Jones's claim that his trial counsel was ineffective for failing to request a mistrial after Ms. Alexander relayed the threats made by Jones. Such evidence was admissible and there were no grounds for a mistrial. Jones's claims of ineffective assistance of trial counsel for failing to move for a mistrial or request an admonishment are therefore without merit.

[18] Jones also claims that his trial counsel was ineffective for failing to somehow exclude Ms. Alexander's testimony regarding Jones's threats on the grounds that her testimony constituted perjury. Because Ms. Alexander did not mention these threats in her 2004 deposition or her 2004 trial testimony, Jones claims that her mention of them in 2011 must be false. But the fact that Jones did not mention the threats in 2004 does not make her 2011 testimony false. Alexander's 2011 testimony demonstrates, at most, that her earlier testimony was incomplete, not that her later testimony was false.

[19] Given that there is no indication that Ms. Alexander's testimony was false, much less knowingly false, as is required for false testimony to be perjury, we cannot fault Jones's trial counsel for failing to attack or somehow exclude it for

---

that he was more likely to have committed the crimes for which he was on trial. *Id*. at 1053. Here, the State did not introduce evidence that Jones had committed a prior crime and threatened the victim of this prior crime. There was merely a brief mention that Jones threatened Ms. Alexander, and such threats have been held admissible. *Matthews*, 866 N.E.2d at 825.

being perjury. We also therefore reject his claims that his trial counsel was ineffective for failing to request an admonishment and move for a mistrial based upon the alleged falsity of Ms. Alexander's testimony.

[20] Nor can we say that Jones's trial counsel was ineffective for not attempting to impeach Ms. Alexander with her prior statements, in which she did not mention Jones's threats. But the fact that she did not mention the threats in her prior statement is not necessarily inconsistent with her 2011 testimony. And Ms. Alexander was consistent in her testimony that she drove Jones to her house on the night of the shootings and that she heard him throw something out the car window, which splashed in the water beside the street. Counsel's decision not to confront Ms. Alexander with her prior statements, which were consistent with regard to her interaction with Jones on the night of the shooting, did not constitute ineffective assistance.

*B. Testimony Regarding Jones's Demeanor*

[21] Jones contends that his trial counsel was also ineffective for failing to attack or exclude Ms. Alexander's testimony regarding Jones's demeanor on the night of the murders when she drove him to her house in her vehicle. In the 2011 trial, Ms. Alexander testified as follows:

> Q. Okay. So, he [Jones] gets in the car with you. What was his demeanor or how was he acting once he got in the car with you?
> A. Quiet.
> Q. Was that normal for hm?

> A. No.

Tr. pp. 1654–55.

[22] In her 2004 deposition, Ms. Alexander testified:

> Q. When you picked [Jones] up on the evening of January 16th, 2004, how was he acting?
>
> A. His self.
>
> Q. He was acting himself?
>
> A. He was acting himself.
>
> Q. And what is that like when you say "himself?"
>
> A. He didn't seem like anything was wrong.
>
> Q. So he wasn't nervous.
>
> A. No.
>
> Q. Scared?
>
> A. No.
>
> Q. He didn't seem agitated --
>
> A. No.
>
> Q. -- or anything.
>
> A. But the next morning, that Saturday, I fixed him breakfast, he didn't want to eat.

PCR Exhibit Vol. 2, Petitioner's Ex. 10, pp. 22–23.

[23] Again, we cannot say that Jones's trial counsel was ineffective for failing to attack this relatively minor inconsistency in Ms. Alexander's testimony. And we reject Jones's contention that this inconsistency necessarily means that Ms. Alexander's testimony at the 2011 trial was false and constituted perjury.

Therefore, Jones's counsel was not ineffective for failing to object to this testimony or request an admonishment or move for a mistrial based on this allegedly-false testimony.

Nor was Jones's counsel ineffective for failing to attempt to impeach Ms. Alexander's testimony regarding Jones's demeanor. There was, at most, a relatively minor inconsistency in her testimony regarding Jones's demeanor, and trial counsel's choice not to attack her credibility on this issue could well have been a choice not to emphasize that her prior statements were, in relevant part, consistent over time. Moreover, we cannot say that there was a reasonable probability that, but for counsel's decision not to impeach Ms. Alexander's 2011 testimony on the issue of Jones's demeanor, the result of Jones's trial would have been different.

Accordingly, we agree with the post-conviction court that Jones's trial counsel was not ineffective with regard to his handling of Ms. Alexander's testimony.

## II. Lenzo Aaron's Testimony

Jones next argues that his trial counsel was ineffective for failing to object to or move for a mistrial based on portions of the testimony of Lenzo Aaron ("Aaron"). As explained above, Aaron participated in the robbery but denied shooting anyone, and later pleaded guilty and testified on behalf of the State as the key witness at both trials.

## A. Inconsistency in Testimony Regarding Telephone Calls

[27] In the second trial in 2011, Aaron testified that, on the night of the shootings, Jones had two telephone conversations: one with the victim McClendon and the other with an unknown woman. Aaron testified that he was present while Jones spoke with the woman on the telephone for approximately fifteen minutes. Aaron testified that he was not present when Jones spoke with McClendon and therefore did not know when that call took place.

[28] Jones claims that this testimony is in conflict with a proffer statement Aaron gave prior to the first trial in 2004. In that statement, Jones claims, Aaron indicated that Jones had actually spoken to McClendon for fifteen minutes on the telephone, not the woman. Jones argues that his trial counsel was ineffective for failing to point out this inconsistency and object to it on the grounds that it was perjury. Jones's claim fails for a variety of reasons.

[29] First, Jones's trial counsel did use this inconsistency in an attempt to impeach Aaron's testimony. Jones's trial counsel confronted Aaron with his 2004 proffer, noting that it seemed to indicate that Jones was on the phone with a man for fifteen minutes, not a woman. *See* Trial Tr. pp. 1287–1293. Thus, the jury was well aware of this apparent inconsistency.

[30] Second, although Jones claims that Aaron's 2011 testimony was necessarily false, Jones points us to no authority that suggests that one may object to testimony on the grounds that it is false. Indeed, it is up to the jury to decide who is telling the truth. *See Wallace v. State*, 474 N.E.2d 1006, 1008 (Ind. 1985)

(holding that State was under no duty to prevent testimony of witness who gave testimony contradicting another witness or force the witness to admit that he was lying, and that resolution of inconsistencies between witness's deposition and trial testimony which were brought out on cross-examination were for the jury to resolve). The remedy for knowingly false testimony is a charge of perjury, not exclusion of the evidence.

[31] Perhaps more importantly, it is not entirely clear that there was an actual inconsistency between Jones's 2004 statement and his testimony in 2011. In his 2004 proffer statement, Aaron was questioned as follows:

> Q. At some point during this evening, while you guys were playing cards, was there a discussion about someone getting money?
>
> A. At the card table?
>
> Q. Right.
>
> A. No.
>
> Q. Did that happen at all that night?
>
> A. Yes.
>
> Q. Who was doing the talking?
>
> A. Tone [i.e., Jones].
>
> Q. What was he saying?
>
> A. He said Dude called him to take him to get a dime piece, he had all the money. And did we want to go rob him.
>
> Q. Did you ever see Tone on the phone that night?
>
> A. Yes.
>
> Q. What kind of phone.

A. A speakerphone. Nextel.

Q. It was a cell phone as opposed to a land line, is that correct?

A. Yes.

Q. And did you ever hear him identify who he was talking to?

A. No.

Q. Did he ever identify to you who he was talking to?

A. No.

Q. *How long would you say that conversation happened?*

A. *He was talking to **him** for about fifteen minutes.*

Q. Were you in his presence when he was on the phone the whole time?

A. Yes.

Q. What did he say to you when he got off the phone?

A. He didn't say nothing to me.

Q. Where were you?

A. We was sitting, everyone in the house was laughing.

Q. Why were you guys laughing?

A. *He was asking **the girl** if he could come over.*

Q. And have sex with her?

A. Yeah.

Q. Okay. When did you find out about this conversation that Dude was calling and talking of robbing -- of taking his money came up?

A. After he was talking about how he was on the phone with the girl and all that.

PCR Ex. Vol. 1, Petitioner's Ex. 7, pp. 43–44 (emphases added).

[32] Jones claims that Aaron's statement that Jones was "talking to **him** for about fifteen minutes," necessarily means that Jones's telephone conversation with *McClendon* lasted fifteen minutes, which contradicts Aaron's testimony at the second trial that Jones's conversation with the woman lasted fifteen minutes. However, immediately after stating that Jones was talking to "him" for fifteen minutes, Aaron stated that Jones was asking "the girl" if he could come over to her house to have sex. Thus, it is not clear if Aaron was referring to McClendon when he said Jones was on the phone with "him" for fifteen minutes, or if Aaron was referring to the woman and simply used the wrong pronoun, or if the transcriptionist misheard Aaron.[5] Indeed, Aaron claimed at the second trial that the reference to "him" had to be a misprint. Trial Tr. pp. 1292–93.

[33] Even if Jones is correct that Aaron's 2004 statement indicated that Jones spoke with McClendon for fifteen minutes as opposed to the woman, we cannot say that Jones's trial counsel was ineffective for failing to object to the State's use of this testimony on the ground that it constituted perjury. Perjury is a crime defined as making a false, material statement under oath or affirmation, knowing the statement to be false or not believing it to be true, or knowingly making two or more material statements in a proceeding before a court or grand jury which are inconsistent to such a degree that one of them is necessarily

---

[5] Indeed, "him" could well have been a mishearing of the pronoun "them" or "'em," often used as a gender-neutral pronoun. *See The Chicago Manual of Style Online*, § 5.48 "Singular 'they,'" available at: http://www.chicagomanualofstyle.org/book/ed17/part2/ch05/psec048.html ("Normally, a singular antecedent requires a singular pronoun. But because *he* is no longer universally accepted as a generic pronoun referring to a person of unspecified gender, people commonly (in speech and in informal writing) substitute the third-person-plural pronouns *they, them, their, and themselves* (or the nonstandard singular *themself*)").

false. Ind. Code § 35-44.1-2-1(a). And it has long been held that that inconsistency alone is not enough to prove perjury. *Daniels v. State*, 658 N.E.2d 121, 123 (Ind. Ct. App. 1995). Without any suggestion that Aaron's statement was not only false but knowingly false, there was no basis for Jones's trial counsel to allege that Aaron's testimony was perjury.[6]

[34] We also reject Jones's claim that his trial counsel was ineffective for failing to impeach Aaron's testimony with the alleged inconsistency regarding the telephone call. As noted above, Jones's trial counsel *did* confront Aaron regarding this alleged inconsistency in an attempt to impeach him. *See* Trial Tr. pp. 1287–1293.

[35] Still, Jones claims that his counsel should have attempted to (further) impeach Aaron with McClendon's telephone records, which he claims shows that there was no call made by McClendon to Jones and that the conversation did not last fifteen minutes. But McClendon's telephone records show that Jones made a call to McClendon, not the other way around, on the night of the murders at approximately 6:07 p.m. Jones had also telephoned McClendon three other times that day. The salient point was not who called whom, but the content of the call. Under these facts and circumstances, we cannot say that Jones's trial counsel was ineffective for failing to attempt to impeach Aaron's testimony further by referencing McClendon's telephone records, which would have

---

[6] In fact, another witness, Maurice Fuller, testified that Jones spoke with a woman on speakerphone the night of the murder. Tr. pp. 1158–59.

simply emphasized that Jones and McClendon had spoken several times that day.

*2. Inconsistency Regarding the Reason for the Robbery*

[36]    Jones also faults his trial counsel for failing to prevent Aaron from testifying at the second trial with regard to the reason Jones gave the others for robbing McClendon. Jones claims that in the 2004 trial, Aaron testified that Jones told him that McClendon said he wanted Jones to get him "a 9 piece,"[7] i.e., cocaine, and that McClendon "got six G's on him," i.e., $6,000. PCR Exhibit Vol. 1, Petitioner's Ex. 8, p. 81.[8] In other words, at the 2004 trial, Aaron testified that Jones informed him that McClendon had money and was looking for cocaine. According to Jones, Aaron testified to something different in the 2011 trial, i.e., that Jones informed him of an opportunity to rob McClendon of both "drugs" and "money," Appellant's Br. at 34, which he claims is different than Aaron's 2004 testimony where he indicated that Jones stated that McClendon had money and was looking to buy drugs.

[37]    Aaron's testimony at the 2011 trial was as follows:

> Q.    Did [Jones] indicate to you why he was saying, "did you want to go rob this dude"?

---

[7] In Aaron's 2004 proffer statement, this was transcribed as a "dime piece" instead of a "nine piece." PCR Exhibit Vol. 1, Petitioner's Ex. 7, p. 42.

[8] Similarly, in his 2004 proffer statement, Aaron stated that Jones said McClendon called him "to take him to get a dime piece, he had all the money." *Id.*

A.    [Jones] just said *he got six G's on him and a 9-piece and he was trying to --*

Q.    He said he had six G's -- trying to buy a 9-piece?

A.    Yes.

Trial Tr. p. 1199 (emphasis added).

[38]    Jones argues that Aaron's 2011 testimony was that Jones told Aaron that McClendon had "six G's on him" and already had a "9-piece," and that they went to rob McClendon of both. Jones contends that the State had to immediately "correct" Aaron's testimony to make it more consistent with his 2004 testimony by asking, "He said he had six G's -- *trying to buy a 9-piece*." *Id*. (emphasis added). But this is a rigid reading of Aaron's 2011 testimony.

[39]    Aaron's 2011 testimony was that Jones said McClendon "got six G's on him and a 9-piece and he was trying to --" *Id*. We do not know what Aaron would have said if not interrupted by the prosecuting attorney. But when asked by the State if Jones said McClendon had "six G's" and was "trying to buy a 9-piece," Aaron responded, "Yes." Tr. p. 1199. Thus, Aaron's testimony did not actually conflict with his earlier 2004 testimony.

[40]    Moreover, we agree with the State that the salient point of Aaron's testimony was that Jones told him McClendon had cash and asked if Aaron wanted to help him rob McClendon. This aspect of Aaron's testimony was consistent between both trials. At the very least, Jones's trial counsel was not ineffective

for failing to somehow exclude Arron's testimony on this point for being false or perjury.

[41] Nor was counsel ineffective for failing to attempt to impeach Aaron's testimony with regard to the motive. Again, at most, there was a minor inconsistency in Aaron's testimony between trials. And bringing up Aaron's prior statement would have only emphasized that he had consistently testified that Jones told him that McClendon had a large amount of cash and asked for Aaron's help in robbing McClendon.

[42] In short, we are unable to say that the post-conviction court clearly erred when it determined that Jones's trial counsel was not ineffective with regard to his handling of Aaron's testimony.

### III. Maurice Fuller's Testimony

[43] Jones also contends that his trial counsel was ineffective for failing to impeach the testimony of Maurice Fuller ("Fuller"), who testified that he saw Jones with a handgun on the night of the murders. Fuller testified at the 2011 trial that Jones lifted up his shirt and showed him the butt of a black 9 mm or .45 caliber handgun tucked into his waistband. Trial Tr. pp. 1159–60.

[44] Jones contends that his trial counsel was ineffective because he did not attempt to impeach Fuller's testimony by confronting him with his statement to the police in 2004. In his police statement, Fuller stated that he saw in a newspaper that a .45 caliber weapon had been used in the murders. He gave another police

statement the same day stating that James Parks had someone purchase an AK-47 style rifle but failed to mention that he saw Jones with a handgun. Jones claims that his trial counsel was ineffective because he did not impeach Fuller with this prior "inconsistent" statement. We disagree.

[45] Fuller's statements were not inconsistent. The failure to mention Jones's gun to the police is not the same as stating that Jones did not have a weapon. Moreover, in Fuller's other statement to the police that same day, Fuller clearly stated that he had seen Jones with a gun at the card game the night of the murders. *See* PCR Exhibits Vol. 2, Petitioner's Ex. 14, p. 53 ("While at the party I was in the kitchen along with Tone [i.e., Jones] and two other people that I don't recall, but we were joking around when Tone pulled up his shirt and showed a gun stuck in his waist in the front . . . . I remember that so well because it was the first time I had ever seen Tone with a gun."). Thus, there was no inconsistency to impeach Fuller with.

[46] To the extent that Jones's argument is that Fuller never mentioned a .45 caliber weapon until after he read the newspaper referring to this caliber, we again cannot say that his trial counsel was ineffective for failing to attack Fuller's testimony on this point.

[47] Fuller stated to the police that the weapon he saw "looked like a .45 to me, that's what I think it was, and I heard on the news that a .45 was used." PCR Exhibit Vol. 2, Petitioner's Ex. 14, p. 56. Jones's trial counsel testified at the post-conviction hearing that he did not think that impeaching Fuller with his

prior statement would have been helpful because it would have only stressed to the jury that he saw Jones with a weapon. This strategic decision did not fall below an objective standard of reasonableness. Accordingly, the post-conviction court did not err in concluding that Jones's trial counsel was not ineffective for failing to confront Fuller with the minor differences between his testimony in Jones's first trial in 2004 and his second trial in 2011.

## Conclusion

[48] Jones has failed to carry his heavy burden upon appeal of showing that the post-conviction court clearly erred in determining that he was not denied the effective assistance of trial counsel.

[49] Affirmed.

Kirsch, J., and Altice, J., concur.